890 P.2d 313

**Richard NELSON, III and Esther Leina'ala Nelson, Plaintiffs–Appellants,**

**v.**

**Wilmot Burgess BOONE and Elsie Gonsalves Boone, Defendants–Appellees.**

Nos. 17322, 17492.

Supreme Court of Hawai'i.

March 3, 1995.

Terence Yoshioka (Jerel I. Yamamoto and Henry Nakamoto with him on the briefs of Nakamoto, Yoshioka & Okamoto), Hilo, for plaintiffs-appellants.

Robert L. Smith, Kailua–Kona, for defendants-appellees.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

Richard Nelson, III and Esther Leina'ala Nelson (collectively the Appellants) appeal from the circuit court's order dismissing their claims involving a land sale agreement they allegedly entered into with Wilmot Burgess Boone, M.D. (Dr. Boone), and his former wife, Elsie Gonsalves Boone (collectively the Appellees), as well as a related order by the circuit court granting costs and attorney's fees to the Appellees.

On January 25, 1993, the circuit court issued its "Findings of Fact and Conclusions of Law, and Judgment" dismissing all of the Appellants' claims, but reserving jurisdiction regarding attorney's fees and costs. The court subsequently issued an "Order on Defendant[–Appellee]s' Motion for Costs and Attorney's Fees and on Plaintiff[–Appellant]s' Motion for Stay of Judgment Pending Appeal" (Order # 1) dated April 13, 1993. In Order # 1, the court granted the Appellees' motion while also granting in part and denying in part the Appellants' motion.[1] The

circuit court later entered its "Order Denying in Part and Granting in Part Plaintiff[–Appellant]s' Motion to Reconsider Order Awarding Attorney's Fees and Costs and To Lower Amount of Supersedeas Bond" (Order # 2) dated July 12, 1993.[2]

The Appellants attempted to appeal after the circuit court issued Order # 1, but that appeal was dismissed as premature. *See Nelson v. Boone,* No. 17167, Order (September 2, 1993). Appellants also appealed on August 4, 1993 (No. 17322) after the circuit court issued Order # 2. The circuit court subsequently entered judgment on September 23, 1993 (Judgment). Appellants then filed a timely notice of appeal on October 7, 1993 (No. 17492). On November 3, 1993, we issued an order consolidating Nos. 17322 and 17492.

### I. FACTS

The Appellees were involved in divorce proceedings during 1986 and 1987. In these proceedings, attorney Richard Tretheway represented Dr. Boone and attorney Robert Hogan represented Elsie Gonsalves Boone (Mrs. Boone). In the course of the divorce proceedings, the Appellees agreed to sell the subject property. Because the property lacked legal access, the Appellees further agreed to retain attorney Colin Love[3] to initiate an action to establish access to the property in order to enhance its fair market value. Accordingly, Love filed an easement action entitled *Boone v. Ushijima, et al.* on June 16, 1986, on behalf of the Appellees.

The Appellants were among those defendants named in the easement action, and they retained attorney George Yuda as legal counsel. Prior to October 24, 1986, the Appellants sought to purchase the subject property. Negotiations between Love and Yuda ensued. During this process, Love consulted with Dr. Boone and both of the Appellees' divorce attorneys, Tretheway and Hogan, be-

---

1. The court awarded Appellees $8,936.07 in attorney's fees and costs, and directed that judgment be stayed pending appeal subject to the requirement that Appellants post a $123,000 supersedeas bond.

2. In Order # 2, the court reduced the required bond to $10,118.

3. Love represented Dr. Boone in 1977 during an earlier divorce proceeding that was apparently dismissed. Love later became a per diem family court judge whereupon Dr. Boone obtained the services of Richard Tretheway for the divorce proceedings discussed in this opinion.

fore suggesting any counter proposals to Yuda. On February 5, 1987, with the oral consent of Dr. Boone, Tretheway, and Hogan, Love entered into an agreement to sell the subject property. The agreement was reduced to writing in a letter from Yuda to Love dated February 10, 1987 (Agreement). In this Agreement, Yuda indicated that the Appellants accepted Love's offer (on behalf of the Appellees) to sell the Appellees' property:

> for the sum of $52,500 in cash within a reasonable time. *This acceptance is based on the following: That title is clear and unencumbered; that the survey pins are in place and visible;* that title to the property is acceptable to the lending institution which will be providing the funds; that the standard applicable terms of a [Deposit, Receipt, Offer and Acceptance (DROA)] contract would apply and the usual apportionment of the closing cost also apply. . . . As counsel for the [Appellants], I want to be assured as soon as possible that title to the [Appellees'] property is clear and marketable.

(Emphasis added). Love signed a line on the document entitled "AGREED" as "Attorney for [Dr. Boone,]" indicating his acceptance of the terms set out by Yuda.

In preparation for the sale, Dr. Boone located the survey pins on the property as required by the Appellants. While processing the sale, however, the escrow company discovered a break in title related to the access problem. Love contacted Mrs. Boone seeking documents involving the Appellees' purchase of the property from their predecessors in interest. Love testified that Mrs. Boone did not object to the pending sale during this conversation. However, Mrs. Boone later testified that Love failed to mention either the Appellants or the sale of the property.

According to both Dr. Boone and Love, the doctor only agreed to sell the property because of the divorce proceedings. Despite a reluctance to sell, Dr. Boone took no action to disapprove the Agreement, which he acknowledges was entered into upon his authority. Dr. Boone testified that he felt committed to the sale even after the defect was discovered. Furthermore, Love (with Dr. Boone's concurrence) assured Yuda that the Appellees intended to go through with the sale despite the defect. Nevertheless, on August 12, 1987, Love informed Yuda that the Appellants had only two options, "buy the property as is for the agreed to price or . . . withdraw from the deal." Yuda rejected this position. Love subsequently continued his efforts to clear title to the property and apprised Yuda by letter of his actions.

On October 10, 1989, Love once again attempted to recharacterize the deal, contending that clear title was a condition precedent to Yuda's acceptance. Yuda firmly rejected Love's assertions. During this period, Love also filed three motions seeking to extend the time to file his "Statement of Readiness" in the easement action. In each of these motions, Love cited the sale of the property to the Appellants and the title problem as justification for the continuances. Over a year later, Yuda advised Love that the Appellants were making preliminary arrangements for a loan to purchase the property. Then, on November 19, 1990, Love wrote to Yuda advising that Mrs. Boone, now represented by Robert Smith in place of Hogan, would not go forward with the sale. In this letter, Love referred to the divorce decree as a limitation upon his authority to settle the easement action. Love asserted that the sale of the property to the Appellants was linked to the requirements of the divorce decree—in other words, because the property was not sold within six months as contemplated by the divorce settlement, the Agreement became void.

On June 10, 1991, the Appellants received notice that the property was available for sale by the Appellees for $225,000. Consequently, the Appellants initiated an action for specific performance of the Agreement. After trial was held on November 5 and 6, 1992, the trial court issued the following findings of fact relevant to this appeal:

> 7. [The Appellees] have paid the real property taxes due on the subject property from the date of purchase [1974] until the present.

.    .    .    .    .

.

9. By letter agreement dated February 10, 1987, attorneys Love and Yuda entered into an agreement *in order to settle* [the easement action]....

.  .  .  .  .

11. Prior to entering into the letter agreement, Colin Love advised George Yuda that Dr. Boone was willing to sell ... if he could obtain the cash within a reasonable time to facilitate a property settlement in the Boones' pending divorce.

12. A reasonable time for the closing of a contract to sell vacant land in the District of North Kona where financing is involved *and title is unencumbered* is approximately sixty to ninety days.

.  .  .  .  .

17. [The Appellants], who own a parcel adjacent to the subject property refinanced said adjacent property to enable them to consummate the purchase of the subject property. [The Appellants] incurred expenses and interest charges in obtaining refinancing *in preparation for their performance* under the letter agreement and attorney's fees in negotiating the settlement.

.  .  .  .  .

24. [Mrs. Boone] was *unaware that Colin Love had offered to sell* the subject property to [the Appellants] ... *until her deposition was taken* ... on November 15, 1991.

.  .  .  .  .

27. On January 9, 1990, the subject property was appraised for ONE HUNDRED THIRTY FIVE THOUSAND DOLLARS ($135,000).

The trial court also concluded, as a matter of law, that:

1. Dr. Boone's continuous communication with Colin Love during negotiations relating to the subject property was insufficient to confer authority upon Colin Love to enter into a binding agreement on behalf of Dr. Boone with [the Appellants] because the Statute of Frauds (HRS § 656–1) requires there be a writing granting such authority to bind the principal in land sales.

2. Enforcement of the letter agreement is barred by the Statute of Frauds (HRS § 656–1) (*Ignatius Tedesco, III, et ux. v. Gentry Development, Inc., et al.*[,] [ ]540 So.2d 960 (La.1989)[ ) ] because there was no written authority allowing attorney Love to enter into such an agreement.

3. Obtaining financing in preparation for performance under a contract for real property is insufficient part performance to remove the contract from the Statute of Frauds.

4. [The Appellants'] claims herein are barred by HRS § 605–7 because Colin Love had no written authority from his clients to settle [the easement action] nor did the [Appellants] act in substantial reliance on Love's representation nor did they inquire as to his authority to bind the [Appellees] (*McKeague v. Freitas*[,] 40 Haw[.] 108 (1953) [ ) ].

The Appellants assert the following points of error: (1) the trial court erred in concluding as a matter of law that the Statute of Frauds, when applied to the facts and circumstances of this case, precludes specific performance of the Agreement where (a) the Agreement was not signed by the Appellees and the Appellants and (b) Love did not have written authority to sign the Agreement on behalf of the former; (2) the trial court erred in concluding as a matter of law that the Appellants' actions were insufficient to invoke the doctrine of part performance; (3) Findings of Fact ("FOF") 9 and 24 were clearly erroneous—specifically, FOF 9 erroneously implies that the Agreement was intended as a settlement of the easement action rather than a mere purchase-sale arrangement, and FOF 24 erroneously implies that Love did not have Mrs. Boone's unwritten authorization to sign the Agreement or that she did not subsequently ratify the deal expressly or impliedly; (4) the trial court erred in concluding as a matter of law that the (alleged) settlement of the easement action was unenforceable because the Appellees had failed to give Love written authorization to settle the case; and (5) the trial court erred and/or abused its discretion in awarding the Appellees their attorney's fees and costs. Because we rule in the Appellants'

favor on the first, third, and fourth points of error, we need not discuss the other issues presented in this appeal.

## II. *STANDARDS OF REVIEW*

■ With respect to the first and fourth points of error, the standard of review applicable to the circuit court's conclusions of law is the right/wrong standard. *Mehau v. Reed*, 76 Hawai'i 101, 107, 869 P.2d 1320, 1326 (1994). The standard applicable to our review of the circuit court's FOF, the third point of error, is whether they are clearly erroneous. "An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed." *State v. Furutani*, 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994).

## III. *DISCUSSION*

■ Before considering the merits of the parties' positions, we observe that the Agreement signed by Love and Yuda on behalf of their respective principals memorializes the acceptance by the sellers (the Appellees) of the buyers' (the Appellants') offer to purchase the property according to agreed terms including the standard DROA form incorporated by reference therein. The "clear title" term in the Agreement is in the nature of a condition precedent to the Agreement as claimed by Love. *See Handley v. Ching*, 2 Haw.App. 166, 169, 627 P.2d 1132, 1135 ("a condition precedent to an obligation to perform a contract calls for the performance of some act *or the happening of some event after a contract is entered into, upon the performance or happening of which the obligation to perform immediately is made to depend.*") (emphasis added), *cert. denied*, 63 Haw. 675, 627 P.2d 1132 (1981). As in typical real estate transactions, the sellers bear the responsibility of providing clear title at closing. Even if "clear title" is a condition precedent to the Agreement, "no person can

defend against contractual liability on grounds of a condition precedent when he or she is responsible for that condition precedent not being complied with." *Kalinowski v. Yeh*, 9 Haw.App. 473, 478–79, 847 P.2d 673, 677 (1993). Thus, the Boones may not assert their failure to obtain clear title as a defense to the Nelsons' specific performance claim. Consequently, the Agreement represents a contract subject to the availability of traditional defenses, the relevant ones we now examine.

### A. *The Statute of Frauds— HRS § 656–1(4)*

■ The principal issue in this case is whether the Statute of Frauds, Hawai'i Revised Statutes (HRS) § 656–1(4) (1985 & Supp.1992),[4] precludes the enforcement by the Appellants of the Agreement under the facts presented in this case. Although there is a written agreement in this case that is signed by the parties' attorneys, there is no writing authorizing the Appellees' attorney to enter into the Agreement. The Appellants argue that the underlying purpose of the Statute of Frauds is to prevent the perpetration of fraud by refusing to enforce alleged contracts that were not in fact made; in other words, the statute should not be applied mechanically to prevent the performance of agreements that have in fact been reached. The Appellees respond that Hawai'i precedent requires application of the Statute of Frauds in the circumstances of this case.

The Appellees cite *Honolulu Memorial Park, Inc. v. City and County of Honolulu*, 50 Haw. 189, 436 P.2d 207 (1967), for the proposition that Hawai'i courts "strictly enforce the Statute of Frauds requirement that an agent's authority to bind an owner with respect to an interest in real property must be in writing to be enforced." *Honolulu Memorial Park* involved an attempt to enforce an unregistered encumbrance (sewer lines) on land court registered property.

---

4. HRS § 656–1 provides in pertinent part:
   No action shall be brought and maintained in any of the following cases: ... (4) Upon any *contract for the sale of lands*, tenements, or hereditaments, or of over interest in or concerning them; ... unless the promise, contract, or agreement, upon which the action is brought, or some memorandum or note thereof, is *in writing, and signed by the party to be charged therewith, or by some person thereunto by the party in writing lawfully authorized.* (Emphasis added.)

The encumbrance was signed by an individual who was not the landowner at the time, and there was no evidence that the landowner had given actual or apparent authority to that individual to encumber the property.[5] The instant case is distinguishable on the basis that there is evidence that the Appellees gave actual or apparent authority to Love to contract for the sale of the subject property. *See* discussion *infra* this section.

In addition, the Appellees rely upon *Kona Hawaiian Associates v. Pacific Group*, 680 F.Supp. 1438 (D.Haw.1988). *Kona Hawaiian Associates* involved a plaintiff who sought relief from additional defendants who were not bound to the plaintiff by any written agreement. *Id.* at 1442. The United States District Court for the District of Hawai'i held that an agreement contemplating a transfer of land must be in writing—especially where competent transaction lawyers are brought in to draft binding legal agreements—because preliminary negotiations do not reflect an intention to be bound.[6] *Id.* at 1451. Furthermore, the alleged oral contract in *Kona Hawaiian Associates* was *"wholly inconsistent* with the copious paper trail" produced by the attorneys representing the parties in the transaction at issue. *Id.* (emphasis added). The instant case, on the other hand, contains a written agreement, and the paper trail, as well as other compelling evidence, establishes the existence of an actual contract.

Whether the Statute of Frauds bars specific performance of an otherwise enforceable written agreement for the sale of land, which is neither signed by the parties to be charged nor accompanied by a secondary writing that authorizes their attorney to bind his or her clients, raises a question of first impression in this jurisdiction.

■ In *McIntosh v. Murphy*, 52 Haw. 29, 469 P.2d 177 (1970), the court made the following observations concerning the Statute of Frauds:

> its applicability has been drastically limited by judicial construction over the years in order to mitigate the harshness of mechanical application. Furthermore, learned writers continue to disparage the Statute regarding it as "a statute for promoting fraud" and a "legal anachronism."

52 Haw. at 33, 469 P.2d at 180. In addition, "there is considerable discretion for the court to implement the true policy behind the Statute of Frauds, which is to prevent fraud or any other type of unconscionable injury." *Id.* at 37, 469 P.2d at 181 (emphasis added). These sentiments echoed statements made twelve years earlier in *Glockner v. Town*, 42 Haw. 485 (1958). "The purpose of the Statute is to prevent perpetration of frauds by securing the enforcement of contracts that were never in fact made; *it is not to prevent performance of oral contracts that have in fact been made." Id.* at 486 (citing 37 C.J.S., Statute of Frauds, § 180, at 665; § 217, at 713) (emphasis added).

In *Glockner* there was no reason to presume that a check for $100.00—which was written by Town and payable to Glockner—was evidence of an alleged oral contract between the two parties for the sale of real property. Therefore, the court applied the Statute of Frauds. The court's decision was based, in part, on the absence of any evidence showing that Town ever saw or approved the terms of the alleged agreement. Glockner offered a receipt purporting to set forth terms of sale: down payment of $1500.00 on the full price of $14,950.00, in six monthly payments of $100.00, followed by $125.00 or more per month, with six percent interest on the balance. However, the receipt bore only Glockner's signature, and Town had stopped payment on the $100.00 check.

---

5. The only suggestion of authority is that the property was deeded to the individual who signed the encumbrance three or four years *after* the sewer lines were installed. This evidence is insufficient to establish apparent authority. *See infra* this section (discussing the necessary elements of "apparent authority").

6. Various documents produced at trial demonstrated the attorneys' ability to draft expressly binding and non-binding commitments, which tended to prove that the additional defendants did not enter into an oral contract for the purchase of the subject property. *Id.* at 1451.

During the trial that preceded the decision in *McIntosh,* the lower court ruled as a matter of law that the disputed oral employment contract "did not come within the statute, reasoning that Murphy bargained for acceptance by the *actual commencement* of performance." *McIntosh,* 52 Haw. at 30–31, 469 P.2d at 178 (emphasis added); *see also id.* at 31 n. 1, 469 P.2d at 178 n. 1 (indicating the trial court's apparent "desire to avoid a mechanical and unjust application of the Statute"). Although the actual date of acceptance appears to have been a question of fact, the court in *McIntosh* determined that "there is no need to discuss [this issue because] . . . we base our decision in this case on the doctrine of *equitable estoppel* [.]" *Id.* at 32, 469 P.2d at 179 (citing reliance by McIntosh on the oral contract, in the form of *part performance*) (emphasis added). Specifically, McIntosh "moved some of his belongings from the mainland to Hawaii, sold other possessions, leased an apartment in Honolulu[,] obviously forwent any other employment opportunities . . . [and] continued working for Murphy . . . [for] approximately two and one-half months[.]" *Id.* at 30, 469 P.2d at 178.

We conclude that the underlying policy of the Statute of Frauds, as expressed in *Glockner* and *McIntosh,* should be employed under the circumstances presented in the instant case.[7] In other words, the Statute of Frauds should not be inequitably applied to prevent the enforcement of otherwise valid oral contracts or even written agreements signed by agents without the written authorization of their principals. The Appellees may not rely upon the Statute of Frauds—in combination with the failure of the Agreement to coincide with the contemplations of their divorce settlement, a purported condition that is not included within the four corners of the Agreement—to escape the consequences of a bargain fairly made. That Love did not have the Boones' express written authorization, as is technically required by the Statute of Frauds, is insignificant where the substantial evidence in the record demonstrates that the Appellees either expressly or tacitly authorized Love to enter into the Agreement.

Love clearly had actual or apparent authority to enter into the Agreement on behalf of the Appellees.

Actual authority exists only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent to so act, and may be *created by express agreement or implied from the conduct of the parties or surrounding circumstances.* Express actual authority requires an *oral* or written agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain acts. . . . Implied actual authority may arise either independently of any express grant or authority . . . or it may arise as a *necessary or reasonable implication required to effectuate some other authority expressly conferred by the principal.* However, the focus is on the agent's understanding of his authority inasmuch as the relevant inquiry is whether the agent reasonably believes, because of the conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him to so act.

*Cho Mark Oriental Food v. K & K Int'l,* 73 Haw. 509, 515–16, 836 P.2d 1057, 1061–62 (1992) (emphasis added) (citations and internal quotation marks omitted); *see also Alt v. Krueger,* 4 Haw.App. 201, 207, 663 P.2d 1078, 1082 (1983) (holding that "the client is bound by the acts of his attorney within the scope of the latter's authority").

Apparent authority arises when "the principal does something or *permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have.*" The critical focus is not on the principal and agent's intention to enter into an agency relationship, but on whether a third party relies on the principal's conduct based on a reasonable belief in the existence of such a

7. The version of the Statute of Frauds applicable when these cases were decided contains, in relevant part, substantially the same language as the current version. *Compare* HRS § 656–1 *with* Revised Laws of Hawai'i § 190–1 (1955).

relationship. Apparent authority can occur under the following circumstances:

> (1) The principal has manifested his consent to the exercise of such authority or has *knowingly permitted the agent to assume the exercise of such authority;* (2) ... the third person knew of the principal's actions ... and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and (3) ... the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or the transaction executed by the agent does not bind the principal.

*Cho Mark,* 73 Haw. at 517, 836 P.2d at 1062 (emphasis added) (original emphasis and citations omitted).

The Appellees essentially admit that Love had express actual authority to sign the Agreement with respect to Dr. Boone because he orally authorized Love to act as his agent. The dispute in this case involves the purported absence of Mrs. Boone's grant of authority to Love. The Appellees claim that there is no evidence that Mrs. Boone directly or through Hogan authorized Love to sign the Agreement. However, Mrs. Boone testified that Hogan was authorized to settle her jointly-held interest in the subject property. Hogan verbally authorized Love' to sign the Agreement. Furthermore, Mrs. Boone admits that she and Dr. Boone had already decided to sell the property prior to the entry of the divorce decree. The easement action was undertaken in anticipation of selling the property pursuant to the divorce decree and in order to get the best price possible for the property. Mrs. Boone also had knowledge of, and did not object to, Love's filing of the easement action on her behalf. Mrs. Boone further testified that Dr.

Boone negotiated the purchase price for the property and that she left such financial and investment matters to Dr. Boone until their divorce was finalized on April 23, 1987. Finally, at the bottom of a copy of the Agreement, a handwritten note indicates that Love sent a "cc" to her on March 13, 1987.[8]

Notwithstanding this evidence, the circuit court found that Mrs. Boone was "unaware that Colin Love had offered to sell the subject property to [the Appellants] ... until her deposition was taken on November 15, 1991." FOF 24. Implicit in this finding is the determination that Mrs. Boone could not have authorized Love's action. Although Mrs. Boone may not have had actual knowledge of Love's precise actions, there is substantial evidence in the record that she authorized Love to sign the Agreement through Dr. Boone or Hogan. In other words, Mrs. Boone had constructive knowledge of Love's actions.[9] *See Cho Mark,* 73 Haw. at 517, 836 P.2d at 1062 (discussing apparent authority). Furthermore, Love's authority is "a necessary or reasonable implication required to effectuate some other authority [i.e., settlement of the divorce decree by selling the property] expressly conferred by [Mrs. Boone through her agent, Dr. Boone]." *Id.* at 516, 836 P.2d at 1062 (discussing implied actual authority). We hold that FOF 24 is clearly erroneous because the implication that Mrs. Boone did not authorize Love to sell the property is not supported by substantial evidence in the record and we are firmly convinced that the court erred.

Accordingly, we hold that Appellees are bound by the terms of the Agreement notwithstanding the Statute of Frauds.

### B. *HRS § 605-7*

■ A secondary issue in this case is whether the Agreement is otherwise unen-

---

8. We also observe that there is additional evidence in the record suggesting the Appellees' apparent motivation for asserting the Statute of Frauds defense: a substantial increase in the subject property's value. Compared to the agreed upon price of $52,500 in February of 1987, the property was appraised at $135,000 in 1990, and the Boones sought $225,000 for the property in 1991.

9. The Appellees cite *Keller v. La Rissa,* 60 Haw. 1, 3–4, 586 P.2d 1017, 1019 (1978), for the proposition that the circuit court's determination of Mrs. Boone's credibility—i.e., finding in FOF 24 that Mrs. Boone was unaware of Love's offer to sell the property—should not be passed over by this court. However, the existence of *constructive* knowledge on the part of Mrs. Boone does not necessarily conflict with her testimony that she had no *actual* knowledge of the Agreement.

forceable under HRS § 605–7 (1985).[10] FOF 9 implies that the Agreement was intended as a settlement of the easement action. In its fourth conclusion of law, therefore, the trial court concluded that Appellants' claims were barred by HRS § 605–7 because there was no express written authority given to Love to settle the easement action.

Although Love had no written authority to settle the easement action through the sale of the property, neither Dr. Boone, Mrs. Boone, nor the Appellees' divorce attorneys made any timely objections to the written Agreement. Mrs. Boone did not object until her deposition on November 15, 1991, when she "made it clear ... that she [would] not ... go along with the [sale]" through a letter to Yuda from her new attorney, Robert Smith.

We recently indicated that a client's failure to object for over three years to his or her attorney's unauthorized act of consenting to a settlement agreement demonstrated his acquiescence in the attorney's actions. *Hawai'i Housing Authority v. Uyehara,* 77 Hawai'i 144, 151, 883 P.2d 65, 72 (1994) (citing *Scott v. Pilipo,* 25 Haw. 386, 390 (1920)). *Contra Tedesco v. Gentry Development, Inc.,* 540 So.2d 960, 964 (La.1989) (noting that "testimonial proof cannot be used to prove the agent's authority to execute the contract, whether that authority was actual or apparent").

In *Uyehara,* the attorney for lessees in an eminent domain action against the landowner under HRS Chapter 516, the Land Reform Act, settled the dispute by agreeing to dismiss the suit with prejudice on the condition that, inter alia, the lessees be given the opportunity to purchase their leaseholds from the landowner. Uyehara rejected three offers by the landowner to sell the leased fee interest in his lot. Uyehara then attempted to challenge the dismissal of the eminent domain action, alleging that his attorney acted unlawfully by failing to obtain Uyehara's consent to the settlement agreement. We held that Uyehara's motion to set aside the stipulation and order of dismissal was untimely, *see id.,* 77 Hawai'i at 146, 883 P.2d at 67, and added that Uyehara was properly denied relief notwithstanding his attorney's failure to comply with HRS § 605–7. *Id.* at 150–51, 883 P.2d at 71–72.

In the instant circumstances, we hold that Love's failure to obtain written authorization under HRS § 605–7 to settle the easement action by agreeing to sell the property on behalf of the Appellees does not bar enforcement of the Agreement.[11]

## IV. *CONCLUSION*

The record reveals that the Appellees authorized their attorney, either in express oral terms or by express or implied ratification, to enter into the written Agreement to sell their property to the Appellants. The Agreement is enforceable notwithstanding the Statute of Frauds because the statute was not intended to allow parties to avoid the consequences of bargains fairly made. The Agreement is also enforceable notwithstanding the Appellees' attorney's failure to obtain their written authorization to settle the easement action by selling the property because the Appellees acquiesced in their attorney's actions. Therefore, as the prevailing parties, the Appellants are entitled to reasonable attorney's

---

10. HRS § 605–7 provides, in pertinent part, that "practitioners licensed by the supreme court shall have control to judgment and execution, of all suits and defenses confided to them; provided that *no practitioner shall have power to ... settle such matters confided to the practitioner unless upon special authority in writing* from the practitioner's client." (Emphasis added.)

11. The Appellants challenge FOF 9 by relying on Hawai'i Rules of Civil Procedure (HRCP) Rule 41(a)(1)—which requires the filing of a stipulation of dismissal signed by all parties who have appeared in the action—to refute the circuit court's implicit finding that the sale of the property was intended as a settlement of the easement action. Nevertheless, the easement action is still pending; accordingly, the HRCP Rule 41(a)(1) issue will not ripen until after the sale is consummated. If any of the parties declines to agree to dismissal—if, for example, they wish to resolve the underlying dispute conclusively, or pursue costs incurred to date—the easement action will not be dismissed, but the sale of the property will nevertheless stand.

fees and costs under the terms of the standard DROA form incorporated into the Agreement. Accordingly, we reverse the Judgment of the circuit court and remand for further proceedings consistent with this opinion.